AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| NAOMI NATAL HAYNES, | ) | Case No.   19-8122-WM |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

FILED BY _____ D.C.

APR 0 5 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____4/27/18_____ in the county of _____Palm Beach_____ in the
__Southern__ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(a)(5) | Unlawful transfer or delivery of a firearm to a non-resident |
| 18 U.S.C. 1001 | False statement to a Federal Agent |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Timothy Trenschel, Special Agent, ATF
_Printed name and title_

Sworn to before me and signed in my presence.
By Telephone (FACETIME) Per Fed.R.Crim.P.4 and 4.1

Date: _April 5, 2019_
10:51 p.m.

_____
_Judge's signature_

City and state:      West Palm Beach, FL

William Matthewman, US Magistrate Judge
_Printed name and title_

### AFFIDAVIT IN SUPPORT OF
### CRIMINAL COMPLAINT

Your affiant, Timothy D. Trenschel, first being duly sworn, does hereby depose and state as follows:

### INTRODUCTION

1.    I serve as a Senior Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the United States Department of Justice, having been so employed since 2005.  Prior to this I was a metropolitan police officer in Lexington, Kentucky, for over five years.  During my tenure with ATF, I have received specialized training regarding the investigation and enforcement of Federal Firearms violations and have conducted scores of investigations concerning individuals involved in illegal firearms activities, including the illegal trafficking of firearms.

2.    This affidavit is made in support of a criminal complaint and arrest warrant charging **NAOMI NATAL HAYNES** with violations of federal law, that is:

    (i)    Transfer and delivery of a firearm to a person whom the defendant knows, or has reasonable cause to believe, does not reside in the state in which the defendant lives, in violation of Title 18, United States Code, Section 922(a)(5),

        and

    (ii)    False statement to a federal agent, in violation of Title 18, United States Code, Section 1001.

3.    This affidavit is based on my personal knowledge, as well as upon and interviews and information received from other law enforcement officers, and civilian witnesses with personal knowledge of the events described below.  Because this affidavit is being prepared for the limited

purpose of establishing probable cause, it does not contain everything known to me about this investigation.

## **PROBABLE CAUSE**

4.     This investigation began in the spring of 2018, following the purchase of twenty (20) firearms by Naomi Natal Haynes (hereinafter "HAYNES") a Canadian national and legal resident of the United States. The firearms were purchased on three different occasions and from three different federally licensed firearms dealers – all within three weeks of each other.  The first firearm purchase occurred on February 8, 2018, in which HAYNES purchased five handguns from South Florida Shooting Supply, Inc., for an approximate total of $1,668.00.  The second firearm purchased occurred on February 23, 2018, in which HAYNES purchased ten handguns from Grab-a-Gun for an approximate total of $2,209.00.  The third firearm purchase occurred on February 28, 2018, in which HAYNES purchased five more handguns for an approximate total of $952.00.

5.     On April 27, 2018, at approximately 9:00 a.m., your affiant met with HAYNES and conducted a recorded, non-custodial interview at her residence in Boca Raton, Florida. Your affiant identified himself as an ATF federal agent and was accompanied by another ATF special agent. Ms. HAYNES greeted your affiant at the front door and invited both agents into the home to conduct the interview.

6.     During the interview, HAYNES was questioned about the twenty firearms purchased in February 2018. HAYNES initially said that she had bought thirteen handguns. She subsequently admitted completing an ATF Firearms Transaction Record, Form 4473 for the three separate purchases of twenty total handguns.  She said that her purse, containing her $2,000 rent money, had been stolen and that she had bought the guns for the purpose of reselling them. HAYNES explained in part and substance, "I bought them because they were so cheap and I

2

thought it was a good deal....I made like $50....I was buying them for myself to sell.  I saw like a good deal. Like an opportunity....I bought and then sold, and then bought and then sold, and then bought and then sold 'cause [sic] I didn't have the money....I needed that money to buy the next batch of guns."  Regarding the purchasers, she described them as friends and acquaintances or prior dates: "I know them.  They're people that I know....These people (the buyers) all have concealed weapons permits....It's not like I'm just selling them to random people."  HAYNES further described all of the buyers as living, or having lived in Florida, having Concealed Weapons Permits and that all should have Florida driver's licenses.

7.     During the same interview on April 27, 2018, HAYNES said that she only had three handguns remaining, which were locked away in a storage unit in Boca Raton, Florida. She also explained that she had bills of sales for approximately sixteen of the firearms at the same storage unit where the three remaining firearms were secured. HAYNES then agreed to meet the agents at the storage unit a few hours later to inspect the three firearms and obtain copies of the bills of sale.

8.     On April 27, 2018, at approximately 12:40 p.m., agents met HAYNES in the parking lot of Cube Smart, located at 19200 US Highway 441, Boca Raton, Florida, within Palm Beach County and the Southern District of Florida. HAYNES arrived voluntarily in her own vehicle and was not detained. HAYNES then accessed the security gate using a security code to allow the agents entrance into the facility. Thereafter, HAYNES accompanied agents to her specific storage unit and her interactions with the agents were audio recorded.

9.     HAYNES unlocked the unit in the agents' presence. She was then unable to locate the three firearms which she had previously advised would be found inside. HAYNES explained that she shared the unit with her boyfriend and offered to call him because the firearms and "gun boxes" were not there. HAYNES then provided your affidavit with five carbon copies of firearm

3

bills of sale which were located at that time inside the unit. The bills of sales were in the names of S.S., R.P., P.O., I.B. and D.C. and related to the sale and transfer of sixteen total handguns. One of the five buyers listed was R.P., described as a black female. Each of the bills of sale contained information consistent with the makes and models of firearms purchased by HAYNES in February 2018.

10.     After receiving the five bills of sale, HAYNES identified her boyfriend as E.B., a Haitian male, born in June 1972 or 1973. HAYNES also provided telephone numbers for three of the purchasers from her cellphone. HAYNES further explained that all of the purchasers lived in the Southern District of Florida. Specifically, S.S. lived in Hollywood / Pembroke Pines, Florida, but had moved to Atlanta, Georgia. R.P. lived in Tamarac, Florida. P.O. lived in Miramar, Florida and D.C. lived in Miami, Florida. HAYNES explained that she personally knew all five purchasers and that she connected with the purchasers through "word of mouth." She further explained that the purchasers were not random people.

11.     At approximately twenty minutes into your affiant's recorded interaction with HAYNES at the Cube Smart, she was reminded that it was unlawful to lie to federal agents. In part and substance, your affiant and HAYNES engaged in the following conversation:

| | |
|---|---|
| Affiant: | The bad thing you could do . . . cause we're federal agents . . . you understand that, right. . . |
| HAYNES: | Yes. |
| Affiant: | The bad thing . . . you remember Martha Stewart . . . the lady on TV that does fancy crafts. Do you remember that she spent some time in prison?  Do you remember why? |
| HAYNES: | Because she lied. |
| Affiant: | Exactly. |
| HAYNES: | About insider trading. |

Affiant:        You're way ahead of most people I talk to.

HAYNES:      Listen, I get it and I respect the law . . . I am not trying to evade . . .
              I am being a thousand percent honest.

12.      After being reminded that she could go to prison, like Martha Stewart, if she lied to federal agents, HAYNES reiterated that she sold the sixteen firearms to the identified purchasers, S.S., R.P., P.O., I.B. and D.C. HAYNES also stated that she "would never have boughten [sic] guns for anybody in my name or anything because I know that comes back to me." HAYNES also advised federal agents "no one solicited me" and "I don't think that any of them would traffic them overseas or anything like that."

13.      Following the interview with HAYNES on April 27, 2018, your affidavit queried Florida's Driver and Vehicle Information Database (DAVID) for information about the five purchasers - S.S., R.P., P.O., I.B. and D.C.  After a diligent search, your affiant was unable to locate any records pertaining to any of the five purchasers. Additionally, your affiant was unable to find any information concerning HAYNES' boyfriend, E.B. Your affiant also attempted to contact the purchasers using the telephone numbers provided by HAYNES during her interview on April 27, 2018.  In calling the provided telephone numbers, the numbers did not ring to any identifiable voicemail.

14.      Subsequent to the interview, your affiant learned that HAYNES crossed into Canada *via* New York on March 1, 2018. This was the very next day after purchasing the last five firearms on February 28, 2018.

15.      On March 18, 2018, HAYNES was encountered in Champlain, New York reentering the United States from Canada. At that time, she was inspected by the Department of Homeland Security, United States Customs and Border Protection ("CBP") while crossing through a checkpoint.  She was found in possession of several cellular telephones and approximately

$4,300 in United States currency. CBP seized two cellular telephones under its border search authority and forensically downloaded the devices before returning them to HAYNES.

16.     On March 28, 2018, the Department of Homeland security forwarded two discs containing a partial download from the devices to ATF as a subject matter expert for review. Within the data collected by CBP from HAYNES' devices, were numerous images of legitimate, fraudulent and counterfeit driver's licenses and Social Security cards. Among the data were images of fraudulent and counterfeit Florida driver's licenses in name R.P. - which was the name of one of the purchasers identified by HAYNES on April 27, 2018. It should be noted that R.P. appeared as a white female in one image of a fraudulent driver's license and a black female in another image of a fraudulent driver's license. Additionally, an image of a counterfeit driver's license in the name of E.B. was located in one of HAYNES' devices. That image was of a white male, rather than a Haitian male as HAYNES had described.

17.     On May 23, 2018, a Taurus 9mm pistol, purchased 89 days prior by HAYNES on February 23, 2018, was seized as part of a narcotics search warrant outside Toronto, Ontario, Canada. The handgun was loaded and chambered and secreted behind the door paneling of a vehicle. The gun's serial number had been obliterated but was raised by police forensic examiners. Then on June 6, 2018, a Ruger .380 pistol, purchased 118 days prior by HAYNES on February 8, 2018, was seized as part of a narcotics search warrant outside Toronto, Ontario, Canada. The gun was thrown by the possessor as he attempted to flee police. The gun's serial number was also obliterated but was raised by police forensic examiners.

18.     Investigation of HAYNES revealed several border crossings from the United States into Canada which were of interest to law enforcement. For instance, in 1999, HAYNES, while crossing the U.S. border, was stopped and her vehicle was found to be equipped with a hidden gas

tank "trap" or contraband compartment and the vehicle was subsequently seized. At that time, HAYNES was residing with her baby's father whose own vehicle had been seized in 1992 at the same border while also crossing with a gas tank trap. Due to other frequent border crossings of HAYNES, border authorities identified an associated Canadian female, E.E., who appeared to be "muling" contraband across the border within minutes of HAYNES' own crossings.

19.     On September 22, 2018, Canadian Border Service Authorities seized a vehicle crossing the Canadian border, which contained a "trap" compartment secreting twenty (20) firearms, including a silencer. The individual driving the vehicle was identified then by law enforcement as the suspected mule, Canadian citizen "E.E." Of the twenty (20) firearms seized from the vehicle, at least seventeen (17) were previously located in the Southern District of Florida and had been purchased from federally licensed firearm dealers by several individuals located within Palm Beach County and the Southern District of Florida.

20.     Of the twenty firearms seized inside E.E.'s vehicle, two pistols had been purchased by K.N. seven days earlier in the Southern District of Florida. An interview with a gun show vendor revealed that K.N. purchased those two pistols from the vendor's table at the same time as another person, A.A. The vendor said that both men appeared to be linked with a third unidentified man also browsing the table. Investigation revealed that A.A. purchased at least two more pistols from a different vendor at the same gun show. Your affiant noted that A.A. purchased two pairs of the exact same inexpensive pistols from two different vendors, which was indicative of firearms trafficking as opposed to firearms collecting. Of the five pistols purchased that day by A.A., four of them were part of the Canadian seizure. The vendor provided to your affiant the telephone number of K.N., which he acquired to communicate about the transfer of one of the two pistols, a special-order Glock 43.

21.     On September 25, 2018, your affiant conducted a non-custodial, recorded interview of K.N. K.N. admitted that he had been at the table with two other men, whom he described as his "brother, Mac" and his "friend, Jeff." K.N. however could not provide any identifying information on either man. He ultimately relented that Mac was neither his brother, nor a close friend and that Mac was prohibited from possessing firearms.   Also during the interview, K.N. seemed to inadvertently utter that "Jeff" was "Mackenzie's friend," though he later said that he didn't remember saying "Mackenzie" and said that "Mac" was probably short for "Michael."

22.     On September 25, 2018, your affiant also interviewed an individual who was the original purchaser of another firearm seized from E.E. on the Canadian border on September 22, 2018. The individual admitted to purchasing the firearm, a Taurus G2C 9mm pistol bearing serial number TLO59987, on July 22, 2018, on behalf "Mackenzie," a/k/a "Mac," who was identified by law enforcement at M.D. The individual explained that in June 2018, he was solicited by M.D. to sell eight personal pistols and an assault rifle to M.D.   Within three weeks later, M.D. asked the individual to "straw purchase" pistols for him.[1]  The individual explained that he accepted the offer to be a straw purchaser for M.D. and that M.D. compensated him in United States currency.

23.     The individual admitted during the interview that on July 1, 2018, he straw-purchased, at the direction of M.D., six identical .40 caliber Smith & Wesson pistols from a federally licensed gun dealer for approximately $1,595.00.  The individual further admitted that on July 18, 2018, he straw-purchased, at the direction of M.D., two identical 9mm Taurus pistols from a Federally-licensed gun dealer for approximately $625.29.

---

[1]     For the purpose of this affidavit, a "straw purchase" is a criminal act in which a firearm is bought by one person on behalf of another person who is prohibited from possessing a firearm and therefore unable to legally purchase the firearm themselves.

24.     As the investigation progressed, I learned that M.D. was a convicted felon, on state probation until 2020, and prohibited from possessing firearms and ammunition. Specifically, M.D. was convicted in Palm Beach County of burglary of a dwelling while armed and wearing a facemask, a first-degree felony offense in the State of Florida, on December 19, 2014. M.D. was also convicted of two grand theft offenses, one count of uttering a forgery and one count of fraudulent use of a credit-card, all third-degree felonies in the State of Florida, on January 5, 2015 and March 20, 2015.

25.     In October 2018, Canadian authorities reported that a fingerprint recovered from the firearms seizure on September 22, 2018, specifically a thumbprint inside of a Glock pistol box, matched that of M.D.

26.     In furtherance of this investigation, law enforcement developed the second individual interviewed on September 25, 2018, as a confidential source (hereinafter "CS"). On January 31, 2019, M.D. contacted the CS using iMessaging from an Apple device. In the electronic message at approximately 2:20 p.m., M.D. asked the CS about acquiring additional firearms using the CS as a straw buyer in exchange for United States currency. As the investigation continued, the CS and M.D. agreed to conduct a straw purchase of firearms on February 7, 2019. As a last minute change, M.D. directed the CS to take M.D.'s girlfriend, S.H. to the gun shop in his place. It should be noted that S.H. is HAYNES' daughter.

27.     On February 7, 2019, at 12:31 p.m., the CS picked up S.H. in Delray Beach, Florida and traveled to Shoot Straight, a federally licensed firearms dealer located in Palm Beach County Florida. Prior to going into the gun shop, S.H. was recorded telling the CS, "let me give you this money before you go inside . . ." S.H. also instructed the CS to tell the gun dealer "don't say it's for me. I'm just tagging along with you." S.H. then provided the CS with $1,280.00 in United

States currency prior entering the store. S.H. and the CS then went inside Shoot Straight where the CS selected two firearms for purchase.

28.     The first firearm was a Glock, Model 43, 9mm handgun with a purchase price of $449.00. The second firearm was a Springfield Armory, Model XD, 9mm handgun with a purchase price of $379.00. The total price being $890.96, including tax and the cost of a background check through the Florida Department of Law Enforcement ("FDLE") as required with the disposition of any firearm by a licensed firearm dealer. The CS completed the sale by paying the licensed dealer $900.00 in United States currency, derived from the money previously paid to the CS by S.H. before walking inside the store. It should also be noted that your affiant confirmed that both firearms were not manufactured in the State of Florida and thus have travelled in interstate or foreign commerce.

29.     After completion of the sale and the ATF Form 4473, a representative from Shoot Straight advised the CS that his background check through FDLE was not approved. This information was provided to the CS at the direction of ATF in order to delay the transfer of the firearms to the CS and S.H. In fact, because the CS is not prohibited and possesses a concealed weapons permit, the sale would have otherwise been completed if law enforcement were not involved. The representative explained to the CS that he could not transfer the guns until the gun shop receive an approval number. At that point, the CS and S.H. departed Shoot Straight without the two firearms or the money that was used to pay for the guns.

30.     During the return car ride, S.H. told the CS, "but the only problem is he (M.D.) needed the guns to make the flip." S.H. also stated, "I just don't wanna go home and I have no money and I have no things." The CS and S.H. continued to talk about guns and at one point the CS asked about the removal of serial numbers. Specifically, the CS stated, "as long as he like is

taking serial numbers off or something that's, that's all I give a shit about." To which S.H. replied, "Yeah. For sure. That's mandatory. Absolutely mandatory." S.H. also stated during the recorded conversation, "without a doubt he's for sure taking those serial numbers off. Without a doubt."

31.    M.D. was present at the residence when the CS and S.H. arrived back from Shoot Straight on February 7, 2019. M.D. then got into the CS' vehicle and had a conversation with the CS about the firearms – which was recorded using a covert recording device. During the conversation, the CS told M.D. about the denial and mentioned that a restocking fee would be charged if they wanted to get their money back. M.D. replied, "Fuck that." M.D. then instructed S.H. to pay the CS $100.00.

32.    On February 15, 2019, the CS and M.D. engaged in conversation *via* FaceTime using their respective Apple devices. The call was recorded in part by the CS.  In part and substance, M.D. explained the urgency of obtaining the two firearms from Shoot Straight. M.D. also told the CS that he received money from another unidentified person for the guns. M.D. explained that he let "them" know that it was "done," but that this is "what happened" and it is "going to take a few days to get done." The CS then replied, if "they" want to take that "250 hit" . . . to which M.D. replied, "I don't think they want to take that 250 hit because it's already 800." The CS then explained the denial and hold by Shoot Straight and claimed that he spoke to the owner of Shoot Straight, and that he might get all the money back. The CS also said to M.D. that "his name" is on them and told M.D. to have "them" call me. During the call M.D. acknowledged the prior guns that were purchased by the CS for M.D. and stressed that he owed "them" money in the past, but that he did not want to go through anything with them again. M.D. also indicated "they" were like family.

33.     On February 27, 2019, the CS delivered the two firearms purchased on February 7, 2019, to M.D. at his residence in Delray Beach. It should be noted that the residence was cohabitated by S.H., who is HAYNES' daughter. Once the firearms were transferred to M.D., he was arrested by ATF. Law enforcement also executed a search warrant at M.D.'s and N.H.'s residence.

34.     In the early morning hours of February 28, 2019, your affiant received a telephone call from HAYNES. She advised that she was in Canada and was notified of M.D.'s arrest and the investigation that involved her daughter. HAYNES offered that she would be returning to Florida in March 2019 and agreed to meet with law enforcement upon her return.

35.     On March 13, 2019, your affiant met with HAYNES in Fort Lauderdale, Florida at the Broward County Sheriff's Office. HAYNES arrived at the facility by her own means and was not detained. She was escorted into a video-recorded interview room where she was interviewed by your affidavit and a Broward County Sheriff's Deputy assigned to the Secret Service as a Task Force Officer. Before the interview began, HAYNES your affiant advised HAYNES of her *Miranda* warnings and reminded her that it was unlawful to lie to federal agents.

36.     During the interview, HAYNES admitted that she had lied to your affiant on April 27, 2018, concerning the disposition of the twenty firearms she had purchased in February 2018. HAYNES explained that the names she provided, S.S., R.P., P.O., I.B. and D.C., were all identities that she had fabricated in order to obtain unwarranted credit. HAYNES further indicated that the firearms had been provided to another individual in the Southern District of Florida and at the direction of a Canadian drug lord, for whom HAYNES had been working for more than a decade.

37.     On April 5, 2019, your affiant met with HAYNES again in Fort Lauderdale, Florida, at the Broward County Sheriff's Office. HAYNES arrived at the sheriff's office on her

own accord and was not in custody.  During a recorded interview, HAYNES admitted that she lied about providing the firearms to an individual in the Southern District of Florida.  Rather, HAYNES admitted to driving the firearms from Florida to New York and delivering the firearms to a third person for the purpose of trafficking the firearms into Canada.  She also admitted to traveling into Canada to receive payment for her role in the offense.  Furthermore, HAYNES admitted that her daughter's boyfriend M.D. obtained firearms for her.

38.     Based upon this investigation, I learned that on March 1, 2018, at approximately 8:54 p.m., E.E. entered into Canada from New York. On that same date, March 1, 2018, at approximately 9:06 p.m., which was twelve minutes later, HAYNES also entered into Canada at the same location in New York.

39.     Based upon this investigation, I also learned that on September 22, 2018, at approximately 2:45 p.m., E.E. entered into Canada from New York.  On that same date, September 22, 2018, at approximately 3:47 p.m., which was sixty-two minutes later, HAYNES also entered into Canada at the same location in New York. HAYNES admitted that she had trafficked firearms on more than three§ occasions.

## CONCLUSION

40.     Based upon the facts contained in this affidavit, I submit there is probable cause to

believe that NAOMI NATAL HAYNES has violated federal law, that is, transfer and delivery of

a firearm to a person whom the defendant knows, or has reasonable cause to believe, does not

reside in the state in which the defendant lives, in violation of Title 18, United States Code, Section

922(a)(5) and false statement to a federal agent, in violation of Title 18, United States Code,

Section 1001.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Timothy D. Trenschel
Special Agent, ATF


SWORN TO AND SUBSCRIBED BEFORE
ME THIS 5 DAY OF APRIL 2019,
AT WEST PALM BEACH, FLORIDA.
10'. 52 p.m.
By Telephone (FACETIME) Per. Rule 4 and 4.1 FRCP

HON. WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**

**Defendant's Name**:  **NAOMI NATAL HAYNES**

**Case No.**:  18-8122-WM

**Count # 1:**

Transfer and Delivery of Firearm to Non-resident

Title 18, United States Code, Section 922(a)(5)

**\*Max. Penalty**:   10 Years Imprisonment; 3 Years Supervised Release; $250,000
Fine and $100 Special Assessment.

**Count # 2:**

False Statement To A Federal Agent

Title 18, United States Code, Section 1001

**\*Max. Penalty**:   5 Years Imprisonment; 2 Years Supervised Release; $250,000
Fine and $100 Special Assessment.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-8122-WM

**UNITED STATES OF AMERICA**

**v.**

**NAOMI NATAL HAYNES,**

       **Defendant.**
                          /

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  ___ Yes  ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___ Yes  ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:

ADAM C. McMICHAEL
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0772321
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:   (561) 820-8711
Fax:  (561) 820-8777
Email:  Adam.McMichael@usdoj.gov